IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **TRANSCOR ASTRA GROUP S.A.,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No._____ |
| | § | |
| | § | |
| **PETROLEO BRASILEIRO S.A. –** | § | |
| **PETROBRAS,** | § | |
| | § | |
| Defendant. | § | |

## ORIGINAL COMPLAINT

Plaintiff Transcor Astra Group, S.A. ("Astra") files this Original Complaint against Defendant Petroleo Brasileiro S.A. – Petrobras ("Petrobras"). In support of Astra's claims herein, Astra respectfully alleges the following:

### I. SUMMARY OF CLAIMS

1. On December 5, 2007, Astra (on its own behalf and on behalf of its subsidiaries and affiliates) and Petrobras entered into a written agreement for Petrobras to acquire Astra's interest in an oil refinery located in Pasadena, Texas (the "Purchase Agreement"). Under the Purchase Agreement, Petrobras agreed to purchase Astra's 50% indirect ownership in Pasadena Refining System, Inc. (the "Refinery") for $700 million. Petrobras also agreed to purchase Astra's indirectly-owned interest in PRSI Trading Company LP (the "Trading Partnership") for $87,665,431.95.

2. Under the terms of the Purchase Agreement, the "Effective Date" of the transaction was to be as of October 1, 2007. A central term of the Purchase Agreement was that

after the Effective Date Petrobras was not only entitled to all of the net revenues of the Refinery and Trading Partnership, but was also responsible for furnishing any funds, whether by way of capital contributions, loans, or the like, required to conduct the business of the Refinery and the Trading Partnership. Consistent with these terms and after signing the Purchase Agreement, whenever funds were required they were provided solely by Petrobras, which did not ask for any contributions from Astra. Similarly, after the signing of the Purchase Agreement, Petrobras began directing the operations of the Refinery and Trading Partnership unilaterally. Astra acquiesced in this unilateral control because it believed that Petrobras intended to honor the Purchase Agreement. Petrobras has now reversed its position, claimed that the Purchase Agreement was neither authorized nor a valid contract, and has begun formal legal proceedings seeking to have the Purchase Agreement declared non-binding. Petrobras has also begun insisting that Astra provide in excess of $200 million in cash and guarantees for the Refinery and the Trading Partnership, and participate in Board meetings to ratify retroactively, among other things, decisions related to capital expenditures and funding undertaken unilaterally by Petrobras. Notwithstanding Astra's repeated requests, Petrobras has failed to perform its obligations under the Purchase Agreement and to close the transaction. This repudiation and breach of the Purchase Agreement by Petrobras has damaged Astra in an amount in excess of $787,665,431.95.

## II. PARTIES

3. Plaintiff Transcor Astra Group, S.A. is a Belgian corporation with its principal place of business in Belgium. Astra engages in, among other things, investments in refinery assets.

4. Defendant Petroleo Brasileiro S.A. – Petrobras is a Brazilian corporation with its principal place of business in Rio de Janeiro, Brazil. Petrobras is engaged in the exploration, production, refining, trading and transportation of oil products, natural gas, petrochemical products, electricity, and related activities. Petrobras is a publicly-traded company that is controlled, in part, by the Brazilian government through a 32.2% ownership stake in the company's total shares and a 55.7% stake in its common shares. Petrobras' securities are traded on both the Sao Paulo and New York Stock Exchanges. Petrobras may be served with this Complaint and Summons in compliance with 28 U.S.C. § 1608(b)(2) by serving Theodore M. Helms, Petrobras' General Manager in the United States, at 570 Lexington Avenue, 43rd Floor, New York, New York 10022-6837. Because Petrobras may be an agent or instrumentality of the Brazilian Government, service may also be made pursuant to the Inter-American Convention of Letters Rogatory and Additional Protocol, to which the United States and Brazil are both parties.

### III. JURISDICTION

5. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1330(a). Petrobras may be an agent or instrumentality of a "foreign state" as defined by 28 U.S.C. § 1603. However, Petrobras is not immune from this suit pursuant to, *inter alia*, 28 U.S.C. § 1605(a)(2) and (3).

6. This Court has personal jurisdiction over Petrobras pursuant to 28 U.S.C. § 1330(b). Also, Petrobras has continuous and systematic contacts with the United States and is doing business within Texas and elsewhere in the United States. Petrobras' actions as alleged herein occurred in whole or in part in Texas and elsewhere in the United States. Finally, representatives of Petrobras have regularly traveled to Texas and elsewhere in the United States to conduct business, out of which business Astra's claims arise. In connection with many of the

events described herein, Petrobras acted through its subsidiary Petrobras America Inc., which Petrobras controls.

## IV. VENUE

7.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(f).  A substantial part, if not all, of the events or omissions giving rise to Astra's claims occurred in this district, and Petrobras is currently doing business in this district.

## V. FACTUAL BACKGROUND

8.   The Refinery is an independent oil refining facility in Pasadena, Texas.  The Refinery is located strategically on the Houston Ship Channel with an approximate 100,000 barrel per day refining capacity for crude oil.  In January 2005, an Astra subsidiary acquired a 100% interest in the Refinery from Crown Central Petroleum.  A few months later, Petrobras expressed an interest in acquiring one-half of Astra's indirectly-owned interest in the Refinery.

### A. Petrobras' 2006 Purchase Of One-Half Interest

9.   On March 20, 2006, certain of Astra's and Petrobras' affiliates and subsidiaries entered into a Stock Purchase and Sale Agreement and a Limited Partnership Formation Agreement, whereby an Astra subsidiary agreed to sell one-half of its interest in the Refinery to Petrobras.  In addition, the parties agreed to form the Trading Partnership to enter into a processing agreement with the Refinery, provide feedstocks, and to trade and market refined products.

10.  Because Petrobras was a Brazilian corporation that had agreed to invest in an American petroleum business, federal approval was required for the transaction.  The necessary regulatory approval was obtained from the United States Department of Treasury, and the purchase of the one-half interest became effective on September 1, 2006.  As a result of the

transaction, the parties held their respective 50% interests in the Refinery and Trading Partnership through subsidiaries.

11.     As stated in Article 2 of the Shareholders Agreement, dated September 1, 2006, entered into by the relevant subsidiaries of Astra and Petrobras, an intent and purpose of the Refinery was to institute and complete a "Revamp Project" in order for the Refinery to devote at least 70% of its capacity to process heavy crude oil supplied or owned by Petrobras or its affiliates into refined products.  The Refinery had not been constructed to process heavy crude oil, and both parties agreed that the costs associated with converting the Refinery's operations to process heavier crude oil would be very substantial.  In recognition of this fact, and as a major inducement to Astra's agreement to sell a 50% interest in the Refinery and to participate in the Trading Partnership, Petrobras agreed to provide crude oil at prices that would allow the combined enterprise a guaranteed rate of return after-tax of not less than 6.9% for each year during the fifteen years commencing with the commercial operation of the Revamp Project.  However, shortly after Petrobras' acquisition of its one-half interests, and contrary to the agreement of the parties, Petrobras unilaterally introduced and began insisting on a project that would instead double the capacity of the Refinery, at costs substantially higher than the originally-anticipated Revamp Project, and stated that the guarantee of the 6.9% after-tax return and their obligation to supply crude oil did not apply to such expansion.  These and other disagreements about the future strategic business plans for the Refinery led the parties into discussions of a buyout by Petrobras of Astra's 50% interests in the Refinery and Trading Partnership.  Such a buyout would allow Petrobras to implement the Refinery conversion and other business objectives as it wished.

12. During September 2007, the President of Petrobras and a member of its Board of Directors, José Sérgio Gabrielli ("Gabrielli"), represented to Gilles Samyn ("Samyn"), Astra's Chairman of the Board, that Nestor Cervero ("Cervero"), Petrobras' Managing Director of International Activities, was authorized to negotiate on behalf of Petrobras. Thereafter, during November 2007, Samyn and Cervero engaged in discussions and correspondence concerning the details of Petrobras' potential acquisition of Astra's 50% indirect ownership interests in the Refinery and the Trading Partnership. Cervero also repeated the representation by Gabrielli that Petrobras was prepared to purchase Astra's indirect interests in the Refinery and in the Trading Partnership.

**B.    The 2007 Purchase Agreement**

13. On December 5, 2007, as a result of the ongoing negotiations, Samyn and Cervero – on behalf of Astra and Petrobras, respectively – executed the Purchase Agreement. The material deal terms included: (1) Petrobras would purchase the 50% ownership interest in the Refinery controlled by Astra for $700 million; (2) the Trading Partnership would be liquidated, and 50% of the net value of the Trading Partnership would be paid to Astra's subsidiaries on the closing of the transaction; (3) the Effective Date of the transaction would be October 1, 2007; and (4) as of the Effective Date, Petrobras would bear all responsibility for capital expenditures or other financial contributions and, correspondingly, would be solely entitled to the revenues of the Refinery.

14. The Purchase Agreement expressly contemplated that the parties would "negotiate, in good faith and as soon as possible, the text of a definitive agreement," but otherwise recognized that it was binding in all respects. The Purchase Agreement expressly

stated that it was the parties' intention "to fix the agreement in principle regarding the main items of the transaction."

15. Over the course of negotiations leading up to the Purchase Agreement, Cervero represented that he had authority from Petrobras' Board of Directors to negotiate and to close the transaction on the terms in the Purchase Agreement, including, specifically, to purchase the ownership in the Refinery for $700 million.

16. Following execution of the Purchase Agreement, the parties began performing under the Purchase Agreement. Unlike the situation before the Purchase Agreement was signed, Petrobras began to direct all capital and operating expenditures at the Refinery.

17. On February 1, 2008, Petrobras and Astra submitted the Purchase Agreement for regulatory approval to the United States Department of Treasury's Committee on Foreign Investment in the United States ("CFIUS"). Petrobras attached a copy of the Purchase Agreement to the CFIUS filing and confirmed that the "agreed" purchase price for the interest in the Refinery was $700 million. Nowhere in the submission to CFIUS did Petrobras indicate that the Purchase Agreement was not binding or not authorized by Petrobras.

18. By March 2008, representatives for Petrobras and Astra had negotiated and agreed upon the terms of the formal documentation contemplated by and needed to close under the Purchase Agreement. During these negotiations, the parties agreed that in lieu of liquidating the Trading Partnership, as originally contemplated under the Purchase Agreement, Petrobras would instead acquire Astra's indirectly owned interest in the Trading Partnership, in return for the payment of $87,665,431.95, in addition to the $700 million for the Refinery interest. By March 2008, all of the required regulatory approvals had been obtained and the transaction was ready to close.

## C. Petrobras' Breach Of The Purchase Agreement

19. Following the signing of the Purchase Agreement, in response to requests from the Refinery's Petrobras-appointed Chief Financial Officer, Petrobras provided the Refinery and the Trading Partnership with over $200 million to enable the Refinery and Trading Partnership to conduct business. This was consistent with the terms of the Purchase Agreement, which required Petrobras to fund the operations of the Refinery and Trading Partnership after the October 1, 2007 Effective Date, and absolved Astra from any responsibility to do so thereafter. However, in late May and early June 2008, contrary to the terms of the Purchase Agreement, Petrobras began indicating that it now wanted Astra's subsidiary to provide funds to support the operations of the Trading Partnership and the Refinery and to ratify retroactively certain other actions taken unilaterally by Petrobras. On June 17, 2008, Petrobras requested that Astra's representatives attend meetings of the boards of the Refinery and Trading Partnership and adopt resolutions that would require Astra's subsidiary to guarantee an additional $150 million debt and provide a cash contribution in excess of $58 million. As part of this request, Petrobras also demanded that Astra's subsidiary ratify all of the actions taken unilaterally by Petrobras at a time when Astra acquiesced in Petrobras' control of the enterprise because of the buy-out embodied in the Purchase Agreement with its October 1, 2007 Effective Date. Further, on June 19, 2008, Petrobras commenced certain formal proceedings in which Petrobras denied the validity and enforceability of the Purchase Agreement, and sought a declaration that the Purchase Agreement was not binding upon Petrobras. These actions by Petrobras constituted a repudiation of the Purchase Agreement.

20. Petrobras has continued to press Astra's subsidiaries to make capital contributions and to assume other financial burdens and obligations of the Refinery. Astra has repeatedly

requested that Petrobras meet its obligations under the Purchase Agreement and close the transaction, but instead of doing so, Petrobras has begun the above mentioned proceedings to obtain a declaration that the Purchase Agreement was not a binding contract. This conduct by Petrobras, which constitutes a wrongful repudiation and breach of its obligations under the Purchase Agreement, has caused damages to Astra in excess of $787,665,431.95.

## VI. CAUSES OF ACTION

### COUNT I. - BREACH OF THE PURCHASE AGREEMENT

21. Astra re-alleges and incorporates the allegations in all previous paragraphs as if expressly set forth herein.

22. Astra and Petrobras entered into a valid and binding contract as described herein and as evidenced by the Purchase Agreement signed by the parties.

23. At all relevant times, Astra has been willing and able to perform its obligations under the Purchase Agreement. Petrobras has repudiated its obligations under the Purchase Agreement and despite repeated requests, Petrobras has failed to perform under the Purchase Agreement, thereby breaching the contract.

24. Petrobras' breach of the Purchase Agreement has directly and proximately caused damage to Astra in excess of $787,665,431.95 and within the minimum jurisdictional limits of this Court.

### COUNT II. - ATTORNEYS' FEES

25. Astra re-alleges and incorporates the allegations in all previous paragraphs as if expressly set forth herein.

26. Petrobras' conduct and the resulting damage and loss to Astra necessitated Astra's retention of the undersigned attorneys. Pursuant to section 38.001 Texas Civil Practice and

Remedies Code, Astra is entitled to recover from Petrobras an additional sum to compensate Astra for its reasonable and necessary attorneys' fees and costs of court in the preparation and prosecution of this action, as well as a reasonable fee for any and all necessary appeals to other courts.

## PRAYER FOR RELIEF

**WHEREFORE,** Astra requests that this Court grant it judgment against Petrobras and award to Astra:

(i). Astra's economic, actual and consequential damages in excess of $787,665,431.95;

(ii). pre-judgment interest as may be provided by law;

(iii). necessary and reasonable attorneys' fees and costs of court through trial and appeal of this action;

(iv). post-judgment interest at the highest lawful rate from the date of judgment until such judgment is satisfied; and

(v). such other and further relief to which Astra may be entitled.

Dated: July 1, 2008

Respectfully submitted:

**K&L GATES, LLP**

By: _/s/ Beth W. Bivans_
Beth W. Bivans (Attorney-in-Charge)
Texas Bar No. 00797664
Fed. Id. No. 29628
Andrew B. Russell
Texas Bar No. 24034661
Fed. Id. No. 31885
1717 Main Street, Suite 2800
Dallas, Texas 75201
(214) 939-5500 (Tel)
(214) 939-5849 (Fax)

Gerald A. Novack
David S. Versfelt
599 Lexington Avenue
New York, New York 10022
(212) 536-3900 (Tel)
(214) 536-3901 (Fax)

**ATTORNEYS FOR PLAINTIFF
TRANSCOR ASTRA GROUP S.A.**